(text box: 1) NO. 5-01-0416

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

LOCAL UNION NOS. 15, 51, and 702, )  Appeal from an Order of the

INTERNATIONAL BROTHERHOOD OF )  Illinois Commerce Commission.

ELECTRICAL WORKERS, )

)

     Petitioners, )

)

v. )  No. 00-199

)

THE ILLINOIS COMMERCE COMMISSION )

and WPS ENERGY SERVICES, INC., and )

BLACKHAWK ENERGY SERVICES, L.L.C., )

) 

     Respondents. )

___________________________________________________________________________

JUSTICE WELCH delivered the opinion of the court:

Local Union Nos. 15, 51, and 702 of the International Brotherhood of Electrical Workers (petitioners) appeal from a decision by the Illinois Commerce Commission (Commission) reaffirming a certificate of authority that the Commission had granted to the respondent, WPS Energy Services, Inc. (WPS), to operate as an alternative retail electric supplier (ARES) under article XVI of the Public Utilities Act (220 ILCS 5/16-101 (West 2000)).  Petitioners specifically challenge the Commission's construction of section 16-115(d)(5) of the Electric Service Customer Choice and Rate Relief Law of 1997 (220 ILCS 5/16-101 (West 2000)) (reciprocity provision).  Petitioners contend that the Commission erred in its construction of the reciprocity provision.  We agree, and for the reasons that follow, we reverse the decision of the Commission and remand for further proceedings.

In 1997, the Illinois legislature passed article XVI of the Public Utilities Act, entitled the Electric Service Customer Choice and Rate Relief Law of 1997 (Customer Choice Law)  (220 ILCS 5/16-101 (West 2000)).  The Customer Choice Law introduced competition for the first time into the Illinois electricity market and moved the Illinois electric industry from a heavily regulated world toward a competitive marketplace.  
Commonwealth Edison Co. v. Illinois Commerce Comm'n
, 322 Ill. App. 3d 846, 848 (2001); 
Illinois Power Co.
 
v. Illinois Commerce Comm'n
, 316 Ill. App. 3d 254, 257 (2000).  The Customer Choice Law opened the electricity market to participants other than the existing, vertically integrated utilities, and it allowed for the creation of entities called alternative retail electric suppliers.  
Illinois Power Co.
, 316 Ill. App. 3d at 257.  An ARES may or may not be affiliated with an existing utility company, and it is authorized to sell and market electricity to customers.  
Illinois Power Co.
, 316 Ill. App. 3d at 257.

For an entity to operate as an ARES and serve any retail customer or other user in the State of Illinois, the entity must first obtain a certificate of service authority from the Commission.  220 ILCS 5/16-115(a) (West 2000).  A verified application containing information showing that the applicant meets the requirements of section 16-115 must be filed with the Commission.  220 ILCS 5/16-115(b) (West 2000).  The Commission shall then grant the application for a certificate of service authority if it makes certain findings as set forth in subsection (d) of section 16-115.  220 ILCS 5/16-115(d) (West 2000).  

Section 16-115(d) provides as follows:

"(d)  The Commission shall grant the application for a certificate of service authority if it makes the findings set forth in this subsection based on the verified application and such other information as the applicant may submit:

(1)  That the applicant possesses sufficient technical, financial[,] and managerial resources and abilities to provide the service for which it seeks a certificate of service authority.  ***;

(2)  That the applicant will comply with all applicable federal, State, regional[,] and industry rules, policies, practices[,] and procedures for the use, operation, and maintenance of the safety, integrity[,] and reliability[] of the interconnected electric transmission system;

(3)  That the applicant will only provide service to retail customers in an electric utility's service area that are eligible to take delivery services under this Act;

(4)  That the applicant will comply with such informational or reporting requirements as the Commission may by rule establish and provide the information required by Section 16-112.  ***;

(5)  That if the applicant, its corporate affiliates[,] or the applicant's principal source of electricity (to the extent such source is known at the time of the application) owns or controls facilities, for public use, for the transmission or distribution of electricity to end-users within a defined geographic area to which electric power and energy can be physically and economically delivered by the electric utility or utilities in whose service area or areas the proposed service will be offered, the applicant, its corporate affiliates[,] or principal source of electricity, as the case may be, provides delivery services to the electric utility or utilities in whose service area or areas the proposed service will be offered that are reasonably comparable to those offered by the electric utility, and provided further, that the applicant agrees to certify annually to the Commission that it is continuing to provide such delivery services and that it has not knowingly assisted any person or entity to avoid the requirements of this Section.  ***
;

(6)  With respect to an applicant that seeks to serve residential or small commercial retail customers, that the area to be served by the applicant and any limitations it proposes on the number of customers or maximum amount of load to be served meet the provisions of Section 16-115A, provided[] that the Commission can extend the time for considering such a certificate request by up to 90 days[] and can schedule hearings on such a request;

(7)  That the applicant meets the requirements of subsection (a) of Section 16-128; and

(8)  That the applicant will comply with all other applicable laws and regulations."  (Emphasis added.)  220 ILCS 5/16-115(d) (West 2000).  

In the instant case, it is the Commission's construction and application of section 16-115(d)(5) that petitioners challenge on appeal.  We now turn to the facts in the instant case.

On March 2, 2000, WPS filed an application with the Commission.  The application sought a certificate of service authority to operate as an ARES.  WPS sought to serve certain Illinois nonresidential retail customers throughout portions of Illinois.  The application stated that Wisconsin Public Service Corp. and Upper Peninsula Power Company are affiliates of WPS and that these companies own and control electric transmission and distribution facilities for public use and for the delivery of electricity to end-use customers in a defined geographic region in Wisconsin and Michigan.  None of the territories of Wisconsin Public Service Corp. or Upper Peninsula Power Company were open to retail electric competition and customer choice at the time the application was filed.

WPS filed a "Certification of Compliance."  The certification was attached to WPS's application and explained why WPS believed that it complied with the reciprocity provision (section 16-115(d)(5)):  "This compliance is based on the fact that electric power and energy can not be 'physically and economically delivered' [by the affected Illinois utilities] to the service areas of [WPS] *** affiliates."  WPS claimed that it understood that the purpose of section 16-115(d)(5) was to ensure that those Illinois utilities that have opened their service areas to competition have comparable rights to compete in the service areas controlled by utility affiliates of an ARES applicant.  Although WPS acknowledged that the service areas of its affiliates were not open to competition at the time of the application, it argued that because power and energy could not be economically or physically delivered by the affected Illinois utilities to retail customers in the service areas of the WPS affiliates, WPS's application should not be barred on the basis of noncompliance with the reciprocity provision.

On April 18, 2000, the Commission granted a certificate of service authority to WPS, specifically finding, among other things, that it would not be economical for the Illinois utilities in question to deliver electrical power and energy to the service areas of WPS's affiliates.  The Commission found that because it would not be economical for the Illinois utilities in question to deliver electrical power and energy to the service areas of WPS's affiliates, the reciprocity provisions of section 16-115(d)(5) do not preclude WPS from receiving an ARES certificate.

On March 16, 2001, the Commission 
sua sponte
 reopened the proceedings, noting, "[T]he Commission is concerned that it may have erred in construing Section 16-115 of the Act[] and that its construction of the law in two important respects may have erroneously limited the facts it considered[.]" 

On March 28, 2001, petitioners filed a petition to intervene.  Several other parties also filed petitions to intervene.  Petitioners argued in their petition that the Commission should adopt an entirely different construction of the reciprocity provision than it had previously.  Petitioners argued that under the reciprocity provision, 
the applicant
 is required to show that the transmission and distribution of electricity 
can be
 physically and economically delivered by Illinois utilities in whose areas the applicant wishes to provide electricity to end-users 
and the applicant
 was also required to show that the necessary political and administrative actions have been taken in the applicant's or its affiliates' jurisdiction to physically permit the delivery of such electricity by Illinois utilities to end-users in the applicant's or its affiliates' service areas.  Petitioners claimed that there is nothing in the reciprocity provision that suggests that merely because the Illinois utilities cannot "physically and economically" deliver power to the service areas of the applicant or its affiliates, the applicant is exempt from any other requirements set forth in the provision.  Petitioners argued that the "physically and economically delivered" clause must be read as imposing additional requirements on the applicant that must be fulfilled before it may enter the Illinois retail electric supply market.

In response, WPS argued that petitioners misunderstood or misapprehended the reciprocity provision.  WPS contended that the reciprocity provision merely requires an applicant to certify that power and energy 
cannot
 be physically or economically delivered by an Illinois utility, in whose service area or areas the applicant proposes to provide service, to retail customers in the service territory of the applicant or its affiliates.  WPS argued that the section clearly states that if the Commission finds that power and energy cannot be physically and economically delivered by Illinois utilities to the transmission or distribution system of the applicant or its affiliates, then an applicant may be certified regardless of whether the applicant or its affiliates provide delivery services comparable to those offered by Illinois utilities.

Following a hearing, the Commission agreed with WPS and rejected the argument set forth by petitioners.  The Commission agreed with WPS that petitioners' proposed construction "is contrary to the plain language of Section 16-115(d)(5) and would afford no meaning to the qualifying term 'physically and economically delivered.' "  The Commission then reaffirmed its previous ruling, stating that the proper standard when applying section 16-115(d)(5) is whether the Illinois utilities can physically and economically deliver power and energy to the service areas of WPS's affiliates.  The Commission reaffirmed the certificate of service authority, finding, among other things, that because it would not be economical for the Illinois utilities to deliver electric power and energy to the service areas of WPS's affiliates, the reciprocity provision of section 16-115(d)(5) does not preclude WPS from receiving ARES certification.  We now turn to petitioners' arguments on appeal.

On appeal, petitioners challenge the Commission's interpretation, contending that the reciprocity provision is ambiguous.  Petitioners then turn to the legislative purpose in enacting the Customer Choice Law and argue that the section must be construed to require that an applicant meet the physically deliverable test and the economically deliverable test 
and
 demonstrate that the applicant or applicant's affiliates' service area is open to competition.  Petitioners contend that the construction of the Commission is erroneous because nowhere does the provision provide that 
if
 an Illinois utility company cannot physically or economically deliver power in the ARES applicant's service area, 
then
 the applicant is relieved of the burden of demonstrating reciprocity.

In response, WPS contends that the reciprocity provision is not ambiguous and that the Commission's construction is consistent with the plain language of the statute.  WPS further contends that petitioners' interpretation is unreasonable and absurd, that petitioners are merely attempting to create an ambiguity where none exists, that petitioners' contention that the language in the provision should be read in the conjunctive is wrong, and that no conflict exists between the provision and the preamble to the Customer Choice Law.  WPS contends that the Commission's construction was reasonable in that the reciprocity clause applies only if an ARES applicant or its affiliate owns a public utility to which electric power and energy can be physically and economically delivered by the Illinois utilities.  WPS continues that the statute plainly reads that 
if
 electric power and energy can be physically and economically delivered, 
only then
 must that public utility provide the Illinois utilities with the opportunity to compete in its service areas.  WPS argues that the plain language of the statute provides that if the utility cannot physically and economically deliver power to the ARES applicant's service area or service area of its affiliates, then the inquiry ends and the remaining conditions in the section do not apply.

We point out that the Commission has also filed a brief on appeal.  In that brief, the Commission argues that petitioners' construction of section 16-115(d)(5) is in error: "Nowhere in [the provision] is there an explicit requirement that an ARES *** 
prove or demonstrate
 that its utility relatives' territories are open to competition."  (Emphasis in original.)  The Commission further argues that the provision merely requires that reasonably comparable delivery services be provided 
if
 it is proved that electricity can be physically and economically delivered.  The Commission contends that the purpose of the General Assembly in enacting the Customer Choice Law was to create and increase competitive retail markets for electricity in Illinois and that the Commission's construction of the provision advances that purpose whereas petitioners' construction leaves the words "physically and economically delivered" without meaning.  Finally, the Commission contends that if the General Assembly wanted to bar affiliates of out-of-state utilities from adding their competitive weight in Illinois, it could have specifically done so.

Where we are called upon to address the Commission's interpretation of its own rules, we must keep in mind that the Commission's interpretation is considered to be 
prima facie
 reasonable and that we may not interfere with its interpretation unless the administrative construction is clearly erroneous, arbitrary, or unreasonable.  
Commonwealth Edison Co. v. Illinois Commerce Comm'n
, 322 Ill. App. 3d 846, 849-50 (2001).  As our supreme court has noted, although we are not bound by the Commission's interpretation of a statutory standard, due to an agency's experience and expertise, we should generally give substantial weight and deference to the interpretation of a statute by the agency charged with the administration and enforcement of the statute.  See 
Illinois Power Co. v. Illinois Commerce Comm'n
, 111 Ill. 2d 505, 511 (1986); 
Commonwealth Edison Co.
, 322 Ill. App. 3d at 854.

In the instant case, the issue before us is the Commission's construction of section 15-116(d)(5).  When a court interprets a statute, the primary objective is to ascertain and give effect to the intent of the legislature.  
Illinois Bell Telephone Co. v. Illinois Commerce Comm'n
, 262 Ill. App. 3d 266, 274 (1994).  The best indication of what the legislature intended is the statutory language itself.  
Metro Utility Co. v. Illinois Commerce Comm'n
, 262 Ill. App. 3d 266, 274 (1997).  Clear and unambiguous terms are to be given their plain and ordinary meaning (
West Suburban Bank v. Attorneys' Title Insurance Fund, Inc.
, 326 Ill. App. 3d 502, 507 (2001)), and where statutory provisions are clear and unambiguous, the plain language as written must be given effect, without reading into it exceptions, limitations, or conditions that the legislature did not express.  
Davis v. Toshiba Machine Co.
, 186 Ill. 2d 181, 184-85 (1999).

However, where the language of a statute is ambiguous, 
i.e.
, where it is capable of being understood in two or more different senses by reasonably well-informed people, the court may then look to extrinsic sources in order to ascertain the legislature's intent.  
Wal-Mart Stores, Inc. v. Industrial Comm'n
, 324 Ill. App. 3d 961, 966 (2001).  One of the first sources that should be utilized is the legislative purpose of the statute.  
Wal-Mart Stores, Inc.
, 324 Ill. App. 3d at 966.

In the instant case, we agree with petitioners that section 15-116(d)(5) is "hardly a model of simplicity."  The first sentence in this provision, the sentence at the center of the dispute in this appeal, contains no less than 150 words and three different conditions.  How to read these conditions in the statute is where the parties differ.  Had section 15-116(d)(5) begun the way most of the other subsections in section 15-116(d) begin, simply, "That the applicant," we doubt whether there would be any serious debate over how the statute is to be construed.  However, because the legislature inserted the word "if" as the second word in the sentence, the parties now disagree as to how the provision is to be construed.  We agree with petitioners that the insertion of the word "if" has rendered the statute ambiguous.  The ambiguity caused by this word is best shown by examining the arguments and constructions of the parties.

According to the arguments of WPS and the Commission, "if" is to be given its plain and ordinary meaning–"in the event that"–and applied as follows: "In the event that" the Commission finds that the applicant satisfies the first condition in section 16-115(d)(5), only then must the Commission find that the applicant satisfies the next condition.  In order to achieve this result, however, WPS and the Commission are required to insert a "then" at the end of the first condition, following the word "offered" and before the words "the applicant."
(footnote: 1)  After the substitution and insertion of the terms suggested by WPS and the Commission, the provision would read in part as follows:

"(d) The Commission shall grant the application for a certificate of service authority if it [finds] ***:

* * *

(5) That 
in the event that
 the applicant, its corporate affiliates[,] or the applicant's principal source of electricity (to the extent such source is known at the time of the application) owns or controls facilities, for public use, for the transmission or distribution of electricity to end-users within a defined geographic area to which electric power and energy can be physically and economically delivered by the electric utility or utilities in whose service area or areas the proposed service will be offered, 
then
 the applicant, its corporate affiliates[,] or principal source of electricity, as the case may be, provides delivery services to the electric utility or utilities in whose service area or areas the proposed service will be offered that are reasonably comparable to those offered by the electric utility, and provided further, that the applicant agrees to certify annually to the Commission that it is continuing to provide such delivery services and that it has not knowingly assisted any person or entity to avoid the requirements of this Section."

Although WPS and the Commission contend that the plain and ordinary use of the word "if" renders the provision unambiguous, we disagree, for we believe that the statute is subject to a different, equally reasonable interpretation, when the word "if" is given its other commonly understood meaning.

Petitioners suggest that the word "if" be given its other commonly understood meaning–"on condition that" (Webster's Third New International Dictionary 1124 (1976)).  Under petitioners' suggestion, when "if" is read as "on condition that," the provision reads as follows:

"(d) The Commission shall grant the application for a certificate of service authority if it [finds] ***:

* * *

(5) That 
on condition that (1)
 the applicant, its corporate affiliates[,] or the applicant's principal source of electricity (to the extent such source is known at the time of the application) owns or controls facilities, for public use, for the transmission or distribution of electricity to end-users within a defined geographic area to which electric power and energy can be physically and economically delivered by the electric utility or utilities in whose service area or areas the proposed service will be offered, 
(2)
 the applicant, its corporate affiliates[,] or principal source of electricity, as the case may be, provides delivery services to the electric utility or utilities in whose service area or areas the proposed service will be offered that are reasonably comparable to those offered by the electric utility, and provided further, that 
(3)
 the applicant agrees to certify annually to the Commission that it is continuing to provide such delivery services and that it has not knowingly assisted any person or entity to avoid the requirements of this Section.  ***."

We believe that petitioners' construction is also reasonable, and because the construction offered by WPS and the Commission and the construction offered by petitioners are both capable of being understood by reasonably well-informed people, we find this section to be ambiguous.  Accordingly, in order to ascertain which construction best effectuates the legislative purpose behind this section, we shall turn to the legislative purpose in enacting the statute.

As noted earlier, the purpose of the Customer Choice Law was to introduce competition into Illinois's electricity market.  However, section 16-101A of the Customer Choice Law (220 ILCS 5/16-101A(c) (West 2000)), entitled "Legislative findings," makes clear that the legislature was concerned that the Illinois electrical utilities that had undertaken certain investments be able to maintain, upon the introduction of competition into the market, a reasonable opportunity to obtain a return on their investments.  The legislature noted that it was concerned that new entrants into the industry might be able to take an unreasonable advantage of the investments that had been made by the formerly regulated industry.  220 ILCS 5/16-101A(c) (West 2000).  Specifically, section 16-101A(c) provides:

"With the advent of increasing competition in this industry, the State has a continued interest in assuring that the safety, reliability, and affordability of electrical power is not sacrificed to competitive pressures[] and[,] to that end, intends to implement safeguards to assure that the industry continues to operate the electrical system in a manner that will serve the public's interest.  Under the existing regulatory framework, the industry has been encouraged to undertake certain investments in its physical plant and personnel to enhance its efficient operation, the cost of which it has been permitted to pass on to consumers.  
The State has an interest in providing the existing utilities a reasonable opportunity to obtain a return on certain investments on which they depended in undertaking those commitments in the first instance while, at the same time, not permitting new entrants into the industry to take unreasonable advantage of the investments made by the formerly regulated industry.
"  (Emphasis added.)  220 ILCS 5/16-101A(c) (West 2000).

Clearly, the legislature was concerned with allowing into the market new entrants that might be able to take an unreasonable advantage over the existing utilities.  In light of this clearly stated concern, we believe that petitioners' construction of section 16-115(d)(5) is consistent with this concern, while the construction offered by WPS and employed by the Commission is not.  We agree with petitioners' arguments that the construction offered by WPS and the Commission would give a new entrant an opportunity to take an unreasonable advantage over the existing utilities, for it would allow a new entrant into the Illinois utility market without providing the Illinois utilities affected by the new entrant an opportunity to also compete in the market of the new entrant, hence allowing the new entrant to take an unreasonable advantage of the investments made by the formerly regulated industry.

Accordingly, we believe that petitioners' construction of section 16-115(d)(5) is consistent with the legislative intent and that the construction offered by WPS and employed by the Commission is not.  The legislature made it clear that it did not want Illinois affiliates to be unreasonably taken advantage of, and the construction offered by petitioners best protects this interest.  Because the Commission's construction is not consistent with this above-noted legislative concern whereas the construction offered by petitioners is, we believe that the Commission's construction of section 16-115(d)(5) is unreasonable and erroneous.  

In conclusion, we reverse the Commission's construction of section 16-115(d)(5) and find that the statute must be construed such that before the Commission grants a certificate of service authority, it must find that the applicant complies with each condition set forth in section 16-115(d)(5).  Because the Commission did not engage in this full analysis, we reverse the decision of the Commission and remand this cause to the Commission to reconsider the application in light of our ruling and to address any other issues that may arise.

Reversed; cause remanded.

GOLDENHERSH and KUEHN, JJ., concur.

FOOTNOTES
1:
Such an insertion necessarily follows from the arguments proposed in each of the parties' briefs.  The Commission argues in its brief that the provision "requires that reasonably comparable delivery services be provided 
if
 it is proved that electricity can be physically and economically delivered."  (Emphasis added.)  Furthermore, WPS argues in its brief that the provision "requires the Commission to make a finding of reciprocity *** 
if
 [emphasis added] the applicant" satisfies the first condition of the section.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 06/20/02.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.